Khai DANG, father and natural guardian of Hai Dang, and Khai Dang, individually, Respondent,

v.

ST. PAUL RAMSEY MEDICAL CENTER, INC., Defendant,

Ramsey Clinic Associates, P.A., Appellant.

No. C4-91-2491.

Court of Appeals of Minnesota.

Sept. 22, 1992.

Review Denied Dec. 15, 1992.

Reid G. Rischmiller, Roger J. Aronson, Rischmiller, Wasche, Knippel, Rischmiller & Aronson, Minneapolis, for respondent.

David C. Hutchinson, Geraghty, O'Loughlin & Kenney, P.A., St. Paul, for appellant.

Considered and decided by DAVIES, P.J., and LANSING and NORTON, JJ.

## OPINION

DAVIES, Judge.

Appellant Ramsey Clinic Associates (RCA), a corporation made up of the affiliated doctors who staff Ramsey Medical Center, claims there was no joint enterprise between it and Ramsey Medical Center, a government hospital enjoying the limited tort liability of Ramsey County. Joint enterprise would make RCA jointly liable for the negligence of a resident physician employed by the hospital. Appellant also claims there were irregularities in the trial which deprived it of a fair trial. Finally, appellant challenges the award of damages for future housing and care costs of the patient. We affirm.

## FACTS

On June 23, 1985, Hai Dang, a 20–month–old boy, was seen in the emergency room at St. Paul Ramsey Medical Center (Ramsey Hospital) for difficulty in swallowing resulting from a lump in his neck caused by infection. He was admitted to the pediatric station and his care was assigned to a staff pediatrician employed by defendant RCA. Shortly after his admission, an intravenous line for the administration of antibiotics was placed in Hai Dang's hand. A first-year resident physician, employed by defendant Ramsey Hospital and supervised by a member of RCA, started the IV line. A solution was injected into the line. Immediately thereafter Hai Dang's eyes rolled back. After a second injection he sustained cardiopulmonary arrest. As a result of the respiratory arrest and anoxia, Hai Dang sustained brain injury, resulting in mental and motor retardation.

Respondent commenced this lawsuit against Ramsey Hospital in November 1986 and added RCA as a defendant a year later. A jury trial began on April 15, 1991.

After the jury returned its verdict on May 3, judgement was entered against RCA and Ramsey Hospital on October 30. One judgment was for $1,697,054.11 in favor of Khai Dang as parent and natural guardian of Hai Dang and a second judgment for costs and disbursements in the amount of $5,747.88 in favor of Khai Dang, individually, and as father and natural guardian of Hai Dang. RCA moved for a new trial or alternatively for JNOV, which the trial court denied in an order dated August 2, 1991.

At trial, respondent claimed the resident negligently used potassium chloride to flush the IV line instead of using normal saline (sodium chloride) as a flush solution. Appellants denied fault, asserting that the child had a breath-holding spell, or what is technically called a vaso-vagal response. Respondent also claimed that RCA and Ramsey Hospital were engaged in a joint enterprise in providing medical care to the child and as such are jointly liable for the resident's negligence.

Ramsey Hospital is government owned and operated. Minn.Stat. § 466.04 (1990) limits its liability to $200,000. RCA is a corporation consisting of physicians who practice at Ramsey Hospital. At the time of this incident, all of the physicians in the pediatrics department, except residents, were employed by RCA. Both appellant and respondent agree that Ramsey Hospital and its medical staff employed by RCA had shared goals of patient care, education, community service, public health, and research.

Pursuant to an affiliation agreement with Ramsey Hospital, the University of Minnesota sent pediatric residents to the Hospital. The residents were paid stipends by the University, which was then reimbursed by Ramsey Hospital. The testimony at trial indicated that Ramsey Hospital was to provide an environment for education to take place and that the medical staff would provide the appropriate amount of supervision of the residents while they provided medical care. The medical staff members agreed to be bound by the affiliation agreement between Ramsey Hospital and the University.

Dr. Lucia Lisita was a first-year resident (also called intern). She was on a rotation through Ramsey Hospital in June 1985, at the time of Hai Dang's injury. She was under the supervision of Ramsey Hospital staff, who were employed by RCA. All parties agree that Dr. Lisita was an employee of Ramsey Hospital at the time.

Respondent called three expert witnesses to testify in support of his claim that potassium chloride was negligently used to flush the IV line. Two pediatric neurologists and one pediatric pathologist testified. While all agreed that a patient's potassium level could increase after cardiac arrest, they all believed that Hai Dang's potassium level was higher than one would expect to occur naturally after cardiac arrest. Two physicians testified that this attack could not be attributed to a vaso-vagal event or a seizure or fainting episode. Another doctor testified that she based her opinion that potassium chloride was injected upon several factors: the absence of any underlying disorder in the patient that would have caused cardiac arrest, the timing of the incident, the elevated potassium level after the cardiac arrest, the absence of information to dispute that potassium chloride was the cause, and the absence of any other explanation. She also stated it was surprising that the bottle of solution, all syringes, and the EKG strips were not found after the incident.

## ISSUES

I. Did a joint enterprise exist between St. Paul Ramsey Medical Center and Ramsey Clinic Associates in undertaking the medical care and treatment of Hai Dang?

II. Did the trial court properly instruct the jury on joint enterprise and properly frame the special verdict question regarding joint enterprise?

III. Did the $200,000 limit on municipal tort liability apply to Ramsey Clinic Associates?

IV. Did delay in telling attorneys of a note the jury sent to the court deny Ramsey Clinic Associates a fair trial?

V. Did sufficient evidence on negligence exist to support the jury's verdict?

VI. Did the trial court award excessive damages for the cost of future housing and care of Hai Dang?

## ANALYSIS

### I.

■ Appellant claims this is not an appropriate case for the application of a joint enterprise theory. In Minnesota, courts have historically applied the theory of joint enterprise in automobile cases. *See Pierson v. Edstrom*, 286 Minn. 164, 167, 174 N.W.2d 712, 714 (1970); *Feeser v. Emery*, 270 Minn. 435, 439, 134 N.W.2d 23, 26 (1965); *Ruth v. Hutchinson Gas Co.*, 209 Minn. 248, 259, 296 N.W. 136, 142 (1941); *Murphy v. Keating*, 204 Minn. 269, 273, 283 N.W. 389, 393 (1939). Recently, this court has used the joint enterprise theory in other contexts. *See, e.g., Weber by Sanft v. Goetzke*, 371 N.W.2d 611, 615 (Minn.App.1985), *pet. for rev. denied* (Minn. Sept. 16, 1985) (whether siblings were engaged in joint enterprise in selling lake property).

The joint enterprise concept has also been recognized in medical negligence cases. *See Peterson v. Fortier*, 406 N.W.2d 563, 566 (Minn.App.1987) (joint enterprise might apply between doctors who negligently treated patient), *pet. for rev. denied* (Minn. July 31, 1987); *Spannaus v. Otolaryngology Clinic*, 308 Minn. 334, 339, 242 N.W.2d 594, 597 (1976) (joint enterprise theory might apply in medical malpractice case). We do not believe the jury improperly found a joint enterprise in this case where Minnesota courts have previously recognized its existence in medical malpractice cases.

■ RCA claims the evidence was insufficient for the jury to find that a joint enterprise existed.

A jury's verdict will not be set aside unless it is manifestly and palpably contrary to the evidence. Thus, a jury ver-

dict will be overturned only if no reasonable mind could find as did the jury. *Alevizos v. Metropolitan Airports Comm'n*, 452 N.W.2d 492, 499 (Minn.App. 1990), *pet. for rev. denied* (Minn. May 11, 1990).

The Minnesota Supreme Court initially set out the elements of a joint enterprise in *Murphy*, 204 Minn. at 273, 283 N.W. at 392.

> There are two elements customarily required by the courts to establish joint enterprise, namely, (1) a mutual undertaking for a common purpose, and (2) a right to some voice in the direction and control of the means used to carry out the common purpose.

*See also Leuer v. Johnson*, 450 N.W.2d 363, 366 (Minn.App.1990), *pet. for rev. denied* (Minn. Mar. 16, 1990).

Both appellant and respondent agree that the first element of joint enterprise, a mutual undertaking for a common purpose, was met in this case. The parties understood they would be working together for the common purpose of "medical education and the advancement of medical knowledge through patient care." This was set out in Ramsey Hospital's affiliation agreement with the University of Minnesota, which the staff physicians from RCA agreed would be applicable to them.

Moreover, both RCA and Ramsey Hospital had a voice in the direction and control of Dr. Lisita, the means used to achieve the common purpose of patient care. As employer of the resident, Ramsey Hospital clearly exercised legal control over Dr. Lisita and was liable for her negligence. Staff physicians employed by RCA also had control over Dr. Lisita, however. The affiliation agreement, which sets out the common purpose, includes the following language:

> The selection, appointment, training, supervision and remuneration of interns at St. Paul Ramsey Hospital shall be the primary responsibility of St. Paul Ramsey Hospital, *its staff* and governing body.

(Emphasis added.)

There was substantial testimony regarding RCA's right to control the resident

physician's conduct in starting an intravenous line. At Ramsey Hospital, the function of starting an intravenous line in a pediatric patient is to be performed only by staff or resident physicians. RCA assumed responsibility for training resident physicians and retained the authority to direct the actions of resident physicians. It is significant that all of the staff physicians in the pediatric department are members of RCA. Those doctors are responsible for the medical care provided to the patients, including care provided by resident physicians.

RCA and the Hospital obtain from patients joint authorization for treatment and a joint assignment of insurance benefits. Each patient is told, in effect, that a professional association called RCA and the Hospital will combine their services on the patient's behalf. Here Dr. Lisita's error occurred in an area where the responsibilities of the two organizations overlap. It is, therefore, appropriate that each organization answer vicariously for her misstep.

There is a joint enterprise and resulting joint liability for a mistake that is not within an area of responsibility assigned exclusively to one or the other.

## II.

■ We find no error in the trial court's jury instruction or in the form of the special verdict question regarding joint enterprise. The trial court has broad discretion both in writing jury instructions and in framing special verdict questions. *Hill v. Okay Constr. Co.*, 312 Minn. 324, 340, 252 N.W.2d 107, 118 (1977) (special verdict form); *State v. O'Hagan*, 474 N.W.2d 613, 620 (Minn.App.1991), *pet. for rev. denied* (Minn. Sept. 25, 1991) (jury instructions). In fact, the jury instruction comports exactly with Minnesota law, which sets out the elements of joint enterprise without requiring an *equal* right to control. *Murphy*, 204 Minn. at 273, 283 N.W. at 392; *Leuer*, 450 N.W.2d at 366.

Throughout its brief, RCA argues that to establish joint enterprise Minnesota courts require an *equal* right to a voice in the direction and control of the means used to carry out the common purpose. While it is true that some courts have examined whether the parties had an equal right to make decisions, the majority of decisions setting out the rule for joint enterprise do not specify that an equal right is required. *See, e.g., Pierson*, 286 Minn. at 167, 174 N.W.2d at 714; *Peterson*, 406 N.W.2d at 565. We see no policy reason for a rigid requirement of equality and reject it.

## III.

■ Appellant claims that even if joint enterprise does exist, damages must be limited to $200,000, as was the case for Ramsey Hospital, pursuant to Minn.Stat. § 466.04 (1990), the Municipal Tort Liability Act.

■ Whether or not Minn.Stat. § 466.04 applies to RCA is, on these facts, a question of law. A reviewing court is not bound by and need not give deference to a trial court's determination of a purely legal question. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984). Minn.Stat. § 466.04, subd. 1, provides:

> **Limits; punitive damages.** (a) Liability of any municipality on any claim within the scope of sections 466.01 to 466.15 shall not exceed:
>
> (1) $200,000 when the claim is one for death by wrongful act or omission and $200,000 to any claimant in any other case.

We construe the statute regarding sovereign immunity strictly and not liberally in order to give effect to the underlying purpose and philosophy of tort law which includes compensation of victims. *See Larson v. Independent Sch. Dist. No. 314*, 289 N.W.2d 112, 121–23 (Minn.1979).

■ Appellant claims that RCA, if liable, is Ramsey Hospital's agent and thus the tort liability act applies to RCA. RCA is, however, a joint enterpriser and independently liable. The maximum liability limitations do not extend to the independent liability of a nongovernmental joint enterpriser. *See* Minn.Stat. § 466.04.

## IV.

After nearly four days of deliberations, the jury sent a written note to the trial court indicating that the jury was deadlocked. The note did not ask for an instruction and the trial court did not respond. The next day the trial court informed the attorneys about the existence of the note and counsel met in the judge's chambers to discuss it. The court then asked the jury if additional deliberations would be helpful and the foreperson stated that the jury was making progress and could use additional time to deliberate. The jury continued its deliberations and returned its verdict the same day.

 RCA claims it was denied a fair trial because trial attorneys are entitled to be promptly informed about written communications from the jury. Rule 34 of the Minnesota Civil Trial Book states:

If the jury has a question regarding the case during deliberations, the trial judge shall instruct the foreperson to reduce it to writing and submit it to the bailiff. Upon receipt of such a question, the trial judge shall review the propriety of an answer with counsel, unless waived, outside the hearing of the jurors, in a reported conference. Such writing shall be made a part of the record and the answer given in open court, absent a stipulation to the contrary.

Rule 34 contemplates a question from the jury; there was no question here.

Further, the Minnesota Supreme Court has stated that rules in the trial book are only recommendations, designed to standardize procedures. Because the trial book provides no sanctions for a deviation, Rule 34 does not require reversal. *Cambern v. Sioux Tool, Inc.,* 323 N.W.2d 795, 797 (Minn.1982).

## V.

 Appellant claims the evidence was insufficient for the jury to find Dr. Lisita negligent. Where a jury verdict involves conflicting evidence, an appellate court must consider the evidence in a light most favorable to the verdict and sustain that verdict if possible, on any reasonable theory of evidence. *Alevizos,* 452 N.W.2d at 499.

Ample evidence supports the negligence finding. Potassium chloride was nearby. Everyone in the room at the time Dr. Lisita administered the IV testified that, after Dr. Lisita injected the colorless fluid into Hai Dang's hand, the patient's eyes rolled back, his body stiffened, and he gasped for breath. Upon a second injection, the child had the same reaction, and shortly thereafter went into cardiac arrest at which time his heart stopped beating for approximately 20 minutes.

The child's blood contained an increased level of potassium after the cardiac arrest. Although three of appellant's witnesses testified that increased potassium was normal after cardiac arrest, three expert witnesses testified that Hai Dang's potassium level was too high to be explained merely by the cardiac arrest. One doctor found it significant that the bottle, all syringes, and the EKG strips recorded during the resuscitation efforts had disappeared from the scene.

The evidence of negligence was sufficient.

## VI.

 Finally, appellant claims the jury awarded excessive damages for future care and housing of Hai Dang.

In reviewing the sufficiency of a damage award, we must consider the evidence in the light most favorable to the verdict. *Rayford v. Metropolitan Transit Comm'n,* 379 N.W.2d 161, 165 (Minn.App. 1985), *pet. for rev. denied* (Minn. Feb. 14, 1986). A jury's award of damages will not be interfered with "unless * * * failure to do so would be shocking or would result in plain injustice." *Hughes v. Sinclair Mktg., Inc.,* 389 N.W.2d 194, 199 (Minn.1986).

The jury awarded $1.2 million as the present value of Hai Dang's future housing and care costs. At trial, respondent offered two witnesses regarding the cost of future care. Michael Richardson, a licensed psychologist, testified that Hai Dang will never be capable of living inde-

pendently. He believed the cost of residential living suitable for the child ranges from $17,155 per year to $47,450 per year. He believed Hai Dang's housing needs would be in the mid-range of those two figures. The average of those figures is approximately $32,000 per year. Dr. Roger Walker, an economist from Hamline University, also testified. Dr. Walker used the figures provided by Richardson's testimony and indicated that, assuming a present annual cost of $32,000 per year, the present value of future housing and care costs for Hai Dang ranged between $960,000 and $1,680,000. The jury's award of $1.2 million for future care costs fits squarely within the figures testified to by Dr. Walker.

## DECISION

RCA and Ramsey Hospital were engaged in a joint enterprise in the care and treatment of Hai Dang and, therefore, are jointly liable. RCA's liability is not limited by the Municipal Tort Liability Act. The trial court did not commit reversible error in its handling of the jury's note. Because the evidence of negligence was sufficient to support the jury's determination of negligence and damages, we uphold the trial court's judgment.

Affirmed.